FILED

OCT 0 1 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEBRA WENTZ,

                    Plaintiff,

      v.

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                    Defendant.

CV-08-661-PK

FINDINGS AND
RECOMMENDATION

PAPAK, Magistrate Judge:

      Plaintiff Debra Wentz challenges the Commissioner's decision denying her applications for

disability insurance benefits and supplemental security income payments under Titles II and XVI of

the Social Security Act. The court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The

Commissioner's decision should be affirmed.

      Wentz alleges she became disabled October 27, 2002, due to osteoarthritis in the knees and

lumbar spine, sleep difficulty, hand problems, asthma, and fibromyalgia. Admin. R. 75, 102, 125,

131. In addition to her physical impairments, Wentz alleges her fibromyalgia symptoms include

1 - FINDINGS AND RECOMMENDATION

mental confusion leaving her unable to think clearly enough to work. *Id.* at 240-41. The administrative law judge ("ALJ") applied the five-step sequential disability determination process described in 20 C.F.R. §§ 404.1520 and 416.920. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The ALJ found Wentz's ability to work impaired by osteoarthritis, morbid obesity, and fibromyalgia. Admin. R. 295. He found she had the residual functional capacity ("RFC") to perform only sedentary work with additional postural restrictions, a limitation to simple, routine, repetitive work, and a restriction against concentrated exposure to breathable irritants. *Id.* at 297-98. The ALJ found these limitations precluded Wentz from performing her past work, but left her able to perform other work in the national economy. *Id.* at 303.

The court reviews that decision to ensure that the ALJ applied the correct legal standards and reached findings of fact that are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). Wentz challenges the ALJ's evaluation of the evidence and the resulting RFC assessment. She also contends the ALJ relied on testimony from the vocational expert ("VE") which was not consistent with the Dictionary of Occupational Titles ("DOT") and was elicited with hypothetical assumptions that did not accurately reflect her functional limitations.

## I.    RFC Assessment

The RFC assessment describes the work-related activities a claimant can still do on a sustained, regular and continuing basis, despite the functional limitations imposed by her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. The initial burden of proving the functional limitations that make up the claimant's RFC is on the claimant. 42 USC § 405(g); *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995). The

ALJ must consider all the evidence in the case record including all allegations of limitations restrictions. SSR 96-8p, 1996 WL 374184 * 5. Wentz contends the ALJ failed to accurately assess her RFC because he did not properly evaluate her subjective statements, the medical source statements of James Molloy, M.D., and Francis Kenyon, M.D., and the statements of three lay witnesses.

## A.    Credibility of Wentz's Subjective Statements

In September 2004, Wentz testified that if she stood for too long, her knees would become painful and begin to buckle and grind. This would occur after about 10 to 15 minutes on average, but after only 5 minutes on bad days. Admin. R. 231. Her lower back would become painful if she sat for about 15 to 20 minutes on average, or about 10 minutes on a bad day. She could alternate between sitting and standing for about 1 hour but would then have to lie down. *Id.* at 236, 238-39. Wentz testified that on a typical day she would lie down 7 to 8 times for up to 2 hours each time. *Id.* at 239. On all but 3 or 4 days per month, Wentz would experience fibromyalgia symptoms of flu-like aches, fatigue, and mental confusion significant enough to affect her ability to work. *Id.* at 240-41. During the time she was self employed as a tattoo artist, she typically would miss work or arrive late at her shop almost every day. *Id.* at 245.

In May 2007, Wentz testified that her condition had remained the same as described in her prior testimony. *Id.* at 488. During the interim, she had lost approximately 68 pounds by dieting, her husband had become disabled by mental impairments, and Wentz had given birth to her 6th child. *Id.* at 299, 486-87, 517. She was not taking prescribed medications because she did not want to be sedated while caring for the new baby. *Id.* at 487-88. She testified that she did no housework except preparing dinner; her husband and children did all the household chores. While preparing

dinner, she alternated between standing at the stove and sitting on a chair in the kitchen. *Id.* at 488-89. Wentz testified that on bad days she wanted to sleep all day and would lie down 90 percent of the time. In a typical month she would have 15 to 20 such bad days. *Id.* at 490-91.

The ALJ accepted that Wentz suffered from osteoarthritis in the knees, morbid obesity, and fibromyalgia, and experienced chronic aches and pains and fatigue as a result. He accepted that Wentz's medical condition precluded all but sedentary work with additional significant restrictions on sitting, standing, walking, climbing, kneeling, crouching, and crawling. He also accepted that her symptoms would distract her from work tasks and leave her incapable of anything but simple, routine, repetitive work. The ALJ did not believe Wentz's assertion that she has additional functional limitations which preclude work with appropriate limitations on a full-time basis. *Id.* at 298-99.

In deciding whether to accept subjective statements, an ALJ must first determine whether the claimant has produced objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986). Here the ALJ found the objective medical evidence established osteoarthritis of the knees, morbid obesity, fibromyalgia, a sleep disorder, and asthma. Admin. R. 296-97. The ALJ found these conditions could reasonably be expected to produce some of the symptoms Wentz alleged, but found her allegations as to the intensity, persistence, and limiting effects of her symptoms unsupported by the record as a whole. *Id.* at 299.

Where the claimant has produced objective medical evidence establishing that the she suffers from an impairment that could reasonably produce the symptoms of which she complains, an adverse

credibility finding must be based on clear and convincing reasons. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ must make findings that are sufficiently specific to permit the reviewing court to conclude that he did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). The ALJ should consider objective medical evidence, the claimant's treatment history, daily activities, and work record, and the observations of treating sources and third parties with personal knowledge of the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c), 416.929(c); *Tommasetti*, 533 F.3d at 1039; *Smolen v. Chater*, 80 F.3d 1373,1284 (9th Cir. 1996); SSR 96-7p, 1996 WL 374186.

The ALJ considered all of these factors, except Wentz's work history, in evaluating Wentz's credibility. He found Wentz's allegations consistently disproportionate to the objective medical evidence and uncorroborated by the record as a whole. Admin. R. 299. For example, Wentz complained of disabling knee pain in a worker's compensation claim brought in 2000. Contemporaneous x-rays were normal, MRI images showed no acute changes, and Robert Zirschky, M.D., found "very little mechanical objective evidence of injury." *Id.* at 191. With respect to her present claim of debilitating knee symptoms, diagnostic imaging in 2003 showed only mild osteoarthritis in the left knee and a suggestion of mild narrowing of the joint space in the right knee. *Id.* at 159. A panel of laboratory blood tests was negative for signs of arthritis. *Id.* at 157-58. The grinding and buckling in her knees, which she claimed in her testimony, was not reproduced during examinations. It is reasonable to expect a patient who complains that her knees buckle and grind after standing briefly to exhibit some objective evidence of such an extreme functional result. The

ALJ could reasonably conclude that the minimal objective medical findings did not support Wentz's claim that her knees would grind and buckle after standing for as little as 5 minutes.

Wentz also claimed chronic lumbar pain due to osteoarthritis, but diagnostic images showed only mild narrowing at the L5-S1 disc space with minimal narrowing of the facet joints. *Id.* at 158. The ALJ could reasonably find this minimal objective evidence inconsistent with Wentz's claim that intolerable lower back pain prevented her from remaining seated for as little as 10 minutes at a time. Such a lack of evidence is not sufficient by itself to discredit Wentz's claim, but it is a proper factor for the ALJ to consider.

Wentz alleged her ability to work was impaired by asthma. *Id.* at 296. All indications in the treatment records suggest Wentz's asthma has been fully controlled by medication during the relevant time. Impairments that can be controlled effectively with medication are not disabling for the purposes of the Social Security Act. *Warre v. Comm'r of Soc. Sec. Admin.,* 439 F.3d 1001, 1006 (9th Cir. 2006). The precautionary restriction in the RFC assessment against work requiring concentrated exposure to breathable irritants reasonably accommodates any functional limitation supported by the objective evidence of functional limitations from asthma.

The objective medical evidence supports Wentz's fibromyalgia diagnosis, but does not establish specific functional limitations. In October 2003, Dr. Molloy reached a presumptive fibromyalgia diagnosis based on tenderness to palpation in the paraspinous muscles. Admin. R. 170. In February 2005, Wentz endorsed 18 out of 18 possible tender points on the American Rheumatology Association tender point survey, without false positives on 3 control points. *Id.* at 216. The remainder of Wentz's physical examination was within normal limits and did not establish functional limitations. *Id.* This objective evidence reasonably supports an inference that Wentz

experienced fibromyalgia symptoms such as diffuse body aches and fatigue. The diagnosis by itself does not fully support Wentz's allegations of extreme functional limitations requiring her to lie down and preventing her from thinking clearly almost all day every day. Nor does the objective medical record include other objective findings supporting such limitations

Wentz received a medical diagnosis of sleep disorder from her psychiatrist, Sally Godard, M.D., in June 2005. *Id.* at 423-26. She began using Seroquel at bedtime in September 2005, and it improved her sleep. *Id.* at 420. Wentz then began a planned pregnancy and discontinued all medications. *Id.* at 416. The diagnosis alone does not establish specific functional limitations, particularly in light of her reported improvement with medication. Although Wentz later asserted that Seroquel had lost its effectiveness, her last report while taking the medication was that it helped her sleep. *Id.* at 418, 420, 488. Accordingly, the ALJ could reasonably conclude that the objective medical evidence did not support the allegation of functional limitations from a sleep disorder which persisted while Wentz was adhering to an appropriate medication therapy.

Inconsistencies between a claimant's subjective complaints and the objective medical evidence in the record can constitute specific and substantial reasons that undermine the claimant's credibility. *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999). The ALJ's conclusion that the objective medical evidence did not support Wentz's asserted limitations is a reasonable assessment of that evidence and a proper factor in the credibility analysis. *Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005); *Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007).

The ALJ did not rely solely on the minimal objective medical evidence. The ALJ also relied on Wentz's treatment history in determining her credibility. Admin. R. 295, 299. He noted Dr.

Zirschky's treatment records showed Wentz had poor compliance with left knee treatment and follow up while pursuing her worker's compensation claim in 2000. *Id.* at 295. In August 2000, Wentz was instructed to return to physical therapy immediately after a sympathetic block injection. Her communications with the physical therapist reasonably suggest she attempted to delay or avoid physical therapy. *Id.* at 184. Although Dr. Zirschky clarified his instructions in September 2000, and indicated Wentz would benefit from focused physical therapy, she did not comply with that prescribed treatment. *Id.* at 191-92. This failure to follow her prescribed course of treatment reasonably casts doubt on the sincerity of her contemporaneous claim of disabling knee pain. *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1993); *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir. 1991); *Tonapetyan v. Halter,* 242 F.3d 1144, 1147-48 (9th Cir. 2001). Although these events occurred before the alleged onset of her current disability claim, an ALJ is entitled to consider prior statements of the claimant which appear to be less than candid in assessing the claimant's credibility. *Smolen,* 80 F3d at 1284.

The ALJ also noted that Wentz did not seek treatment for her allegedly disabling conditions from December 2000 until February 2003. Admin. R. 295. Notably, Wentz alleged that her medical conditions began to bother her in August 2002 and became severe enough to prevent her from working in October 2002. *Id.* at 75. The ALJ could draw an adverse inference as to the credibility of Wentz's claims of disabling symptoms from this unexplained failure to seek treatment. *Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir. 2001); *Flaten v. Sec'y of Health & Human Serv.,* 44 F.3d 1453, 1464 (9th Cir. 1995); *Fair,* 885 F.2d at 603.

The ALJ found the progress notes of Wentz's treating psychiatrist contrary to Wentz's allegations of disability. Admin. R. 299. In June 2005, Wentz told Dr. Godard her fibromyalgia

symptoms were "not terribly disabling" for her, but that tiredness from lack of sleep was the biggest problem. *Id.* at 424. On her mental status examination, Dr. Godard found Wentz neat, friendly, and cooperative. Wentz always had good hygiene, contrary to her statement that her symptoms prevent her from "showering for days" leaving her looking "unkempt and greasy." *Id.* at 355. Wentz denied depression and manic behavior and exhibited no evidence of bipolar disorder. Despite that, Wentz consistently refused to try antidepressant therapy recommended for fibromyalgia allegedly because she feared it could trigger a manic phase of bipolar disorder. Wentz had no problems completing multiple activities. Her mood was good and affect appropriate. She had above average intelligence, her concentration and memory were intact, and she showed good insight and judgment. *Id.* at 424-25. In contrast to these findings, Wentz alleged she had developed "a condition where you can barely think most days." *Id.* at 355. Dr. Godard concluded "I do not see significant mental health problems." *Id.* at 425.

Dr. Godard identified stressors affecting Wentz's sleep, including fibromyalgia, financial difficulties, her husband's disabling anxiety disorder, and raising 5 children, including 3 with bipolar disorder and another with anxiety disorder. Her sleep difficulties were exacerbated by a planned pregnancy and the birth of her 6th child, who reportedly did not sleep at night due to colic. *Id.* at 416, 418, 425, 450, 459, 461, 492. Such stressful life circumstances are not proper bases for a disability claim under the Social Security Act. Dr. Godard consistently opined that Wentz dealt with these stressors in a remarkably healthy way and functioned well despite the sleep difficulties the stressors caused. Dr. Godard consistently rated Wentz's global assessment of functioning at 55, indicating no more than moderate difficulty in social or occupational functioning. *Id.* at 416, 418, 420, 421, 425, 450, 452, 454, 456, 457, 459, 461. Dr. Godard did not find any evidence of the mental confusion

which allegedly affected Wentz all day nearly every day and prevented her from thinking clearly enough to work. *Id.* at 240-41.

   The ALJ also found Wentz's reported activities inconsistent with her assertion that she must lie down most of the time and experiences significant mental confusion. Wentz reported that she was the primary care giver for her disabled husband, her four mentally impaired children, and her newborn infant. She did all the driving and shopping, and most of the cooking for the family. She got her children ready and drove them to school. She made, kept track of, and drove to all the appointments for the family members. She ensured that prescriptions were filled and kept track of medications for the whole family. She paid the family bills. *Id.* at 299, 348-55. Consistent with this, Wentz told Francis Kenyon, M.D. in August 2005 that she had too many things to do to be on chronic pain medications. *Id.* at 299, 392. In March 2006, she told Dr. Godard she was sleeping 6 hours a night and functioning pretty well. She only needed a nap occasionally. *Id.* at 450. In February 2007, Wentz told Dr. Kenyon that just taking care of her newborn baby was a full time job. *Id.* at 471. Wentz argues this last statement indicated only that taking care of her baby was the most she was able to manage during a full day. The ALJ could rationally interpret Wentz's statement as an indication that Wentz felt unable to work because she was too busy with domestic duties. This is not a permissible basis for a disability claim under the Social Security Act.

   The ALJ found Wentz's reported activities inconsistent with her testimony that she was unable to work because she had to lie down most of the time and because mental confusion prevented her from thinking clearly all day nearly every day. Admin. R. 239, 240-41, 299, 489-91. Wentz argues the reported activities are not equivalent to full time work and do not prove she is able to function adequately all the time on a full time basis. She argues these activities occur in brief isolated

10 - FINDINGS AND RECOMMENDATION

moments and do not represent her overall level of functioning. She asserts she receives a great deal of help from her disabled husband and her children. Even if the evidence can be interpreted as Wentz urges, the ALJ's interpretation that these activities and statements are inconsistent with Wentz's claims that she must spend 90 percent of the time lying down, almost never thinks clearly enough to work at even simple, routine tasks, and is unable to tolerate even sedentary work on a full time basis, is also within the bounds of reason. The ALJ's interpretation should be upheld, even if it is not the only rational interpretation of this evidence. *Batson,* 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

The ALJ neglected to consider Wentz's work record in determining her credibility. This omission was not harmful to Wentz, however, because the evidence shows Wentz did not stop working due to her medical condition. Admin. R. 75, 189. Although the ALJ should have considered this evidence, the logical inferences to be drawn would not favor Wentz. *See Bruton*, 268 F.3d at 828 (Adverse inference may be drawn where the claimant stopped working for reasons unrelated to disability). Because the ALJ did not rely on this reasoning in his credibility determination, the court cannot rely on it here, beyond the harmless error analysis. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (The court is constrained to review the reasons asserted by the ALJ).

Nevertheless, the ALJ's reasoning satisfies me that he did not arbitrarily discount Wentz's assertions. He considered proper factors and drew logical inferences supported by a rational interpretation of substantial evidence in the record, including the minimal objective medical findings, the failure to seek treatment at the time her condition allegedly became disabling, poor compliance with treatment recommendations, prior statements that appeared to lack candor, the progress notes of Dr. Godard indicating a high level of functioning, and activities suggesting the extreme limitations

she claimed were overstated. This reasoning is clear and convincing and the credibility determination should be upheld. *Tommasetti*, 533 F.3d at 1039.

### B.    Medical Source Statements

Wentz contends the ALJ improperly rejected the disability opinions of Drs. Molloy and Kenyon. An ALJ has a duty to explain by clear and convincing reasons why he or she has chosen to reject a treating physician's opinion that is not contradicted by another physician. *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Dr. Molloy provided Wentz's primary care for approximately 10 months in 2003. In February 2003, Wentz complained of bilateral knee pain which predated her alleged onset of disability by many years and of a recent onset of lumbar pain. On examination, Dr. Molloy noted tenderness in the lumbar midline, but not to a great degree in the paraspinous muscles. Admin. R. 162. Diagnostic images showed mild narrowing at the L5-S1 disc space with minimal narrowing of facet joints. The left knee had mild osteoarthritis and there was a suggestion of mild narrowing of the joint compartment of the right knee. *Id.* at 159. Laboratory blood tests were negative for rheumatoid arthritis. *Id.* at 158. Dr. Molloy diagnosed osteoarthritis and recommended treatment with Arthrotec, an arthritis medication. Wentz did not try the recommended treatment, stating she preferred to rely on aspirin and Tylenol. *Id.*

Dr. Molloy next saw Wentz in June 2003, when she returned requesting that he complete a disabled parking permit form. Wentz complained that her arthritis pain had increased so much that she required a cane to walk. On examination, Wentz had no crepitus in the knees or joint effusion. Dr. Molloy agreed to complete her disabled parking permit form. *Id.* at 157.

Wentz returned to Dr. Molloy in October 2003, complaining of insomnia and progressive pain into the hips and paraspinous muscles. Dr. Molloy found marked tenderness to palpation in the cervical, thoracic, and lumbar paraspinous muscles. He reached a presumptive diagnosis of fibromyalgia. Dr. Molloy prescribed Doxepine, a tricyclic antidepressant medication to help with sleep and pain. *Id.* at 405. Wentz reportedly used the Doxepine, at least briefly, but discontinued it for unclear reasons and refused to try other recommended antidepressant therapies due to unspecified bad experiences of family members who tried such drugs in the past due to a prevalence of bipolar disorder among her family members. *Id.* at 395, 397, 423. Dr. Molloy saw Wentz on two other occasions, primarily for a cough and sinusitis. *Id.* at 196, 199.

On December 30, 2003, Dr. Molloy prepared a disability evaluation letter. *Id.* at 195. He indicated diagnoses of osteoarthritis, asthma, and fibromyalgia. *Id.* at 170. Dr. Molloy was asked to explain how these conditions affected Wentz's ability to perform certain physical activities and nonexertional work activities. Dr. Molloy responded by repeating Wentz's subjective statement with respect to each activity. *Id.* at 171. For example, with respect to concentration, Dr. Molloy indicated that Wentz "states that she is 'always living in a fog.'" *Id.* In response to the question whether Wentz would have a significant probability of missing work frequently, Dr. Molloy indicated "the patient emphatically answers 'yes.'" *Id.* The ALJ found that Dr. Molloy's repetition of Wentz's subjective statements did not represent a medical opinion based on objective diagnostic testing or clinical observations. *Id.* at 300. An ALJ can reject a physician's opinion that is conclusory and unsupported by clinical findings. *Meanal v. Apfel*, 172 F.3d 1111, 1117 (9th Cir. 1999). An ALJ is also entitled to reject a treating physician's opinion that is premised primarily on subjective complaints that the ALJ properly finds unreliable. Under such circumstances, without corroborating clinical findings,

the physician's statement is no more credible than the patient's statements upon which it was based. *Fair v. Bowen*, 885 F.2d at 605; *Tonapetyan*, 242 F.3d at 1149. Accordingly, the ALJ did not err by giving no significant weight to the functional limitations in Dr. Molloy's letter.

Wentz argues the ALJ erred by failing to obtain a consultative psychological evaluation to determine whether her pain might have a psychological basis. This argument stems from Dr. Molloy's statement that he did not believe Wentz was malingering but that her complaints might include a component of somatoform disorder. Admin. R. 172. He suggested neuropsychological and psychiatric testing and a physical capacities evaluation would be the best way to assess her capabilities. *Id.*

The ALJ did not order a consultative psychological evaluation, however, because he had the benefit of Dr. Godard's psychiatric treatment notes. *Id.* at 296-97, 299. Dr. Godard performed a comprehensive psychiatric assessment in June 2005 and treated Wentz with medication and regular counseling sessions through the close of the record. *Id.* at 276, 416-26, 450-64. Dr. Godard found no evidence of significant mental impairment. At most, she found Wentz's discomfort from fibromyalgia to be one of several life stressors contributing to her sleep difficulties. *Id.* at 425. Dr. Godard's treatment plan was designed to help Wentz cope with those life stressors for the purpose of improving her sleep. *Id.*

Wentz argues the ALJ should not have relied on Dr. Godard's findings because Dr. Godard provided only marital counseling with respect to her sleep difficulties. This argument is not persuasive because it reverses the order in which events occurred. Dr. Godard first performed a comprehensive psychiatric evaluation in which she identified sleep difficulties as Wentz's primary problem. She then provided treatment for that problem. Dr. Godard's treatment did not address other

mental health issues only because her evaluation did not reveal evidence of significant mental health issues, including somatoform disorder as a source of Wentz's pain. *Id.*

Furthermore, Dr. Godard's evaluation showed that Wentz was not primarily concerned with fibromyalgia pain, regardless of whether it had a psychological basis. Wentz told Dr. Godard those symptoms were not terribly disabling and that "sleep problems are the biggest difficulty." *Id.* at 425. Taking into account all of Wentz's symptoms and factoring in the effects of her various stressors, Dr. Godard opined that Wentz functioned remarkably well and had no more than moderate impairment in social and occupational functioning. *Id.* at 416, 418, 420, 421, 425, 450, 452, 454, 456, 457, 459, 461. Under these circumstances, the ALJ could reasonably conclude it was unnecessary to determine whether there was a psychological basis for Wentz's symptoms because regardless of their etiology, their functional impact was only moderate.

Dr. Kenyon treated Wentz for bronchitis in May 2005. *Id.* at 394. In August 2005, Wentz returned with complaints of fibromyalgia and degenerative disease. Dr. Kenyon relied on the February 2005 report from the OHSU Comprehensive Pain Center which diagnosed Wentz with fibromyalgia, degenerative disc disease of the lumbar spine, and osteoarthritis. *Id.* at 217. On his physical examination, Dr. Kenyon found no abnormalities except that Wentz appeared depressed and uncomfortable sitting in a chair. Dr. Kenyon suggested treatment with an antidepressant but indicated he saw no rehabilitation potential. *Id.* at 392-93.

Wentz next saw Dr. Kenyon on February 12, 2007, when he completed a one-page state agency functional limits assessment form. *Id.* at 470-71. Dr. Kenyon indicated Wentz was unable to participate in classroom activities, job readiness classes, job search activities, work experience activities, or work. He opined that chronic pain and fatigue from fibromyagia and degenerative joint

disease of the knees, hips, shoulders, and elbows precluded even brief participation in any of these activities. He believed Wentz could not sit longer than 20 minutes at a time. He indicated Wentz was completely disabled and he expected no improvement for at least a year. *Id.* at 470.

Wentz next saw Dr. Kenyon on April 2, 2007, when he completed a treating physician's questionnaire. *Id.* at 262, 472. Dr. Kenyon indicated Wentz could not do any job on a full time basis beginning in October 2003. He indicated diagnoses of fibromyalgia and degenerative disc disease of the lumbar spine. He opined that Wentz was not malingering. Dr. Kenyon indicated Wentz spent 15 to 20 days per month in bed or on the couch resting because of pain and fatigue. *Id.* at 472.

The ALJ pointed out that Dr. Kenyon had only a very brief treatment history with Wentz when he issued the two disability opinions. Despite Wentz's argument to the contrary, this is supported by the record. Dr. Kenyon completed the functional limits assessment in February 2007, at his third appointment with Wentz, and the first in approximately 18 months. He completed the questionnaire in April 2007 on the fourth occasion that he saw Wentz. Dr. Kenyon did not report clinical findings supporting functional limitations in his treatment notes. In addition, the February 2005 report from the OHSU Comprehensive Pain Center, which Dr. Kenyon relied on, did not include clinical findings of functional limitations or propose restrictions on Wentz's activities. *Id.* at 214-17, 392.

In the absence of clinical findings, it was reasonable for the ALJ to infer that Dr. Kenyon reached his conclusions about Wentz's functional limitations and disability based primarily on her subjective reporting. The inference is further supported because the functional limitations in the two disability opinion documents appear first in the subjective portions of Dr. Kenyon's progress notes. *.Id.* at 262, 392, 470, 471, 472. As with Dr. Molloy's opinion, the ALJ could reasonably reject Dr. Kenyon's opinion because it was conclusory, unsupported by clinical findings, and premised

primarily on subjective statements which the ALJ found unreliable. *Meanal*, 172 F.3d at 1117; *Fair*, 885 F.2d at 605; *Tonapetyan*, 242 F.3d at 1149.

The ALJ also believed Dr. Kenyon's disability opinion was completely at odds with his own clinical notes regarding Wentz's reported activities of moving around all day and night due to pain, having too many things to do to take chronic pain medication, and caring for her newborn on a full time basis. I agree with Wentz that the inferences drawn from these statements by the ALJ are not entirely logical. For example, Wentz's statement that she must move around all day and night due to pain cannot reasonably be interpreted to suggest a high level of activity. It logically suggest only that Wentz must change positions frequently to alleviate her discomfort. Despite this flaw, the remaining reasons described previously for rejecting the disability opinions of Drs. Molloy and Kenyon are clear and convincing and the ALJ's evaluation of their opinions should be upheld.

### C.    Lay Witness Statements

Wentz contends the ALJ improperly rejected the statements of three lay witnesses. The statements of lay witnesses regarding a claimant's symptoms and their impact on her ability to function are competent evidence which the ALJ must take into account. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). If the ALJ decides to disregard lay witness testimony, he must explain that determination with reasons that are germane to the witness. *Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 694 (9th Cir. 2009); *Dodrill v. Shalala,* 12 F.3d 915, 919 (9th Cir.1993); *Lewis*, 236 F.3d at 511.

Wentz's husband, Mykel Wentz, provided a third party questionnaire dated May 30, 2003. Admin. R. 106-14. He initially indicated Wentz's typical daily activities were limited to having a cup

of coffee, going to the store, and cooking dinner. *Id.* at 106. He indicated Wentz took care of other family members, and performed her own personal care, except she needed help with her feet. She was able to cook, supervise children, drive, do the family shopping, pay the bills, handle the family finances, and engage in hobbies of writing, using the computer, going to the beach, and watching movies. She did not do housework or chores in the yard. She awoke frequently during the night, sometimes due to pain. *Id.* at 107-10, 349. Wentz's ability to sit, stand, walk, squat, bend, and kneel were limited. For example, Mr. Wentz said after walking about 1000 yards, Wentz would have to rest for a few minutes before resuming. *Id.* at 111. He said Wentz could not help her children with sports activities outside and could no longer go for walks on the beach. *Id.* at 113.

In a second written statement, Mr. Wentz indicated that Wentz's pain had increased over the preceding 3 years. He observed that Wentz could not play catch, ride a bicycle, or go on field trips with her children. He observed that Wentz tended to overdo activities on days when she felt better and then would not be able to do anything for several days. He reported that he and the children do all the sweeping, vacuuming, scrubbing and mopping, and help with the cooking. He observed that Wentz leans on a shopping cart or uses a cane while shopping. He indicated that Wentz has to lie down on the couch and shift her position every few minutes "when things start hurting real bad." *Id.* at 341. On some days, Mr. Wentz has seen Wentz drop everything she picks up "because her hands won't work right." *Id.* Mr. Wentz reported that Wentz does not take arthritis medications because she is allergic to them. She does not take pain medications because addiction to narcotics is not the smart way to deal with pain. *Id.* at 341-42.

The ALJ considered Mr. Wentz's written statements and rejected only one assertion. The ALJ found that Mr. Wentz appeared to overstate the amount of help he gave his wife with domestic chores.

*Id.* at 300. Mr. Wentz is allegedly disabled by severe anxiety and unable to use the telephone, drive, or leave home alone. Presumably his anxiety would not affect his ability to help Wentz with sweeping, vacuuming, scrubbing, cooking, or yard maintenance. Accordingly, the ALJ's reason for concluding that Mr. Wentz did not help his wife as much as he claimed cannot be sustained. Neither that statement, nor any other part of Mr. Wentz's written statements establishes functional limitations in addition to those in the ALJ's RFC assessment, however. Accordingly, there was no harmful error in the ALJ's evaluation of Mr. Wentz's statements.

Wentz's son Nick Wilkes provided a written statement. Wilkes stated that Wentz wakes up day after day in pain, feeling as though she has gotten little sleep, and barely able to think. In addition, Wentz has arthritis in her back and knees which makes walking difficult. Wilkes reported that Wentz cannot walk as far or sit or stand as long as other people he knows who have fibromyalgia. Wentz must change positions constantly. *Id.* at 343-44. The ALJ did not disregard Wilkes's statement without comment. He found it a credible presentation of Wilkes's observations, but did not believe it shed new light on Wentz's functional limitations, because his statements were cumulative. Based on the close similarity of Wilkes's statements to Wentz's own subjective complaints, I take this to mean that Wilkes's statements were of the same nature and subject to the same objections as Wentz's subjective statements and the physicians' opinions that relied on them. In light of the conclusion that the ALJ's reasons for discounting that evidence were clear and convincing, it follows that the same reasons provide sufficient justification for the ALJ's evaluation of Wilkes's lay statements. *Valentine*, 574 F.3d at 694.

Wentz's mother-in-law, Carol Johns, testified that Wentz could not sit, stand, or walk for long periods, or do her housework. Admin. R. 247. Johns estimated Wentz could sit for 15 to 20 minutes,

then would try to move, but would have to sit back down. *Id.* at 248. Johns said she observed Wentz experience terrific pain after walking from one room of the house to another. *Id.* She estimated Wentz could stand for no more than 30 minutes at a time. *Id.* at 250. When asked what she saw Wentz doing during visits to her house, Johns said she saw her sitting or standing. *Id.* at 249. The ALJ found Johns's testimony suggested Wentz was more capable than she alleged. *Id.* at 300. This is a logical inference from comparing Wentz's assertion that she spends ninety percent of the time in bed or lying down on the couch to Johns's observations which did not mention Wentz lying down. John's observations were not obviously inconsistent with the sedentary limitations in the ALJ's RFC assessment. As with Wilkes, Johns's statement is essentially cumulative and subject to the reasoning the ALJ applied in evaluating Wentz's subjective statements and the opinions of Drs. Molloy and Kenyon .

Some of the ALJ's reasoning must be rejected as inadequately germane to the witnesses. The ALJ found the lay testimony of limited value in determining Wentz's functional capabilities because the lay witnesses lacked medical or vocational expertise. *Id.* A lack of expertise is the defining characteristic of all lay witnesses. Such a rationale is too broad because 9th Circuit precedents insist that lay 3rd parties in a position to observe a claimant's symptoms and daily activities are competent to testify regarding how the claimant's condition affects her ability to perform basic work activities. *Valentine*, 574 F.3d at 694, citing *Dodrill*, 12 F.3d at 919. This does not mean that the expertise of a witness cannot be a germane reason in appropriate circumstances. For example, when weighing divergent witness statements, the relative expertise of the witnesses could be a germane factor. In the abstract, however, lack of expertise is not germane to an individual lay witness.

Nevertheless, the ALJ's decision satisfies me that he did not improperly disregard or reject the lay witness statements in assessing Wentz's RFC. He considered the similar allegations of Wentz and the lay witnesses and reached the same conclusions regarding their credibility based on the same considerations. In addition, the RFC assessment reached by the ALJ reasonably reflects the limitations observed by the lay witnesses. Wentz contends the lay witness statements show no more than sporadic activity and do not support the ALJ's conclusion that she can sustain work-related activities on a full time basis. While this may be a reasonable interpretation of the lay witness statements, it is insufficient for Wentz's argument to prevail. The question for this court is whether the ALJ considered the statements and drew rational inferences from the record as a whole. The ALJ did not disregard the lay witness statements without comment; he considered the statements in context with the record as a whole. While the conclusions he reached differ from those Wentz urges, they are not irrational and should be affirmed. *Andrews*, 53 F.3d at 1039.

## II.    Vocational Evidence

At step five of the sequential decision-making process, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do despite the limitations in her RFC assessment. *Tackett v. Apfel,* 180 F.3d 1094, 1099 (9th Cir. 1999); *Andrews*, 53 F.3d at 1043. The Commissioner can satisfy this burden by eliciting the testimony of a VE with a hypothetical question that sets forth all the claimant's limitations and restrictions. 20 C.F.R. §§ 404.1566, 416.966; *Tackett*; 180 F.3d at 1098-99; *Andrews*, 53 F.3d at 1043; *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001).

The ALJ elicited testimony from the VE based on Wentz's age, education, work experience, and RFC. The VE testified that such a person retained the ability to perform sedentary, unskilled

jobs, such as food and beverage order clerk and surveillance system monitor, and light, unskilled jobs with a sit/stand option, such as information clerk. *Id.* at 254-55. The VE testified as to the number of jobs in these occupations that exist in the national economy. *Id.* The ALJ concluded Wentz was not disabled because she retained the RFC to perform jobs which exist in significant numbers in the national economy. *Id.* at 303. Wentz challenges this vocational evidence on three grounds.

First, she contends the ALJ elicited testimony from the VE based on hypothetical assumptions that did not accurately reflect the RFC assessment. The ALJ's written decision reflects a finding that Wentz was "restricted to simple, routine, repetitive work." *Id.* at 298. The ALJ elicited testimony from the VE with a hypothetical limiting Wentz to "simple 1, 2, 3 step work." *Id.* at 253. Wentz contends the two articulations are not equivalent and the VE's opinion is, therefore, not evidence that she can perform the jobs identified. Neither party cites authority or provides persuasive briefing on this point. I conclude that, although not perfectly identical, the two articulations of Wentz's mental limitation overlap substantially and the VE's opinion provides sufficient support for the ALJ's decision.

Second, Wentz argues the information provided by the VE was inconsistent with the information in the *Dictionary of Occupational Titles* ("DOT"). When the ALJ receives evidence from a VE about the requirements of an occupation, the ALJ must ask whether the information is consistent with the information in the DOT. SSR 00-4p, 2000 WL 1898704 * 4; *Massachi v. Astrue*, 486 F.3d 1149, 1152-53 (9th Cir. 2007). Here the ALJ made the necessary inquiry by asking the VE to provide information consistent with the DOT Admin. R. 251. The VE did not identify any conflict.

Wentz, however, argues that the VE deviated from the DOT because the occupations she identified, *viz.* food and beverage order clerk and surveillance system monitor, require reasoning

abilities exceeding her limitation to simple work.  Both occupations are unskilled work which is defined in the regulations as "work which needs little or no judgment to do simple duties." 20 C.F.R. §§ 404.1568(a), 416.968(a).  The DOT indicates the duties and techniques required for these occupations can be learned by an average worker in one month or less.  DOT, Appendix C, *available at* http://www.occupationalinfo.org/appendxc_1.html#III (last visited September 22, 2009).

Wentz relies on the DOT definition trailer, which includes numerical codes indicating the general education development ("GED") levels in reasoning, math, and language, which a worker must have to perform each occupation.  The definition trailers for the jobs identified by the VE indicate a GED reasoning level of 3, which requires a worker to be able to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and] deal with problems involving several concrete variables in or from standardized situations." *Id.*  Wentz contends this attribute of the DOT job descriptions is inconsistent with the VE's testimony that a person limited to simple work could perform the jobs.

Wentz cites no authority holding that a GED reasoning level of 3 exceeds limitation to simple work.  Some courts have suggested that a worker limited to simple work can engage in work requiring at least reasoning level 2. *See Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (level two reasoning appears consistent with "simple and routine work tasks"); *Money v. Barnhart*, 91 Fed.Appx. 210, 214 (3rd Cir. 2004)(reasoning level two does not contradict limitation to simple, routine, repetitive work); *Harrington v. Astrue*, 2009 WL 102689 *2 (S.D.Cal.2009) (simple, repetitive work is consistent with the definition of GED reasoning level two); *Koch v. Astrue*, 2009 WL 1743680 *17 (D.Or. 2009) (level two reasoning is consistent with simple, routine tasks); *Meissl*

*v. Barnhart*, 403 F.Supp. 981, 984 (C.D.Cal. 2005).(same).  Accordingly, I find no apparent conflict between the VE's testimony and the DOT.

To the extent such a conflict exists, I find the record contains persuasive evidence to support the deviation.  The ALJ found Wentz has a high school education and Dr. Godard found no evidence of mental impairment.  The ALJ's limitation to simple, routine work was intended to accommodate mild limitations in concentration, persistence, or pace due to distractions from pain and the effects of sleep difficulties.  Admin. R. 252, 301.  This limitation was not based on a deterioration in Wentz's cognitive function and there is no evidence that she cannot perform work requiring a GED reasoning level 3 occupation.  Accordingly, Wentz's argument is rejected.  The ALJ may rely on VE testimony that conflicts with the DOT, if the record contains persuasive evidence to support the deviation. *Johnson v. Shalala*, 60 F.3d 1428,  1435 (9th Cir. 1995).

Third, Wentz argues the ALJ elicited testimony from the VE with assumptions that did not accurately reflect all of her functional limitations because the ALJ improperly rejected her subjective allegations, the opinions of Drs. Molloy and Kenyon, and the lay witness statements.  For the reasons given previously, Wentz's challenges to the ALJ's evaluation of that evidence cannot be sustained.

The ALJ elicited testimony from the VE based on the RFC assessment and was not required to incorporate additional limitations he found not supported by the record. *Batson*, 359 F.3d at 1197-98; *Osenbrock*, 240 F.3d at 1164-65. *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001). The hypothetical question was proper because it "contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

The ALJ considered all the evidence and framed his vocational hypothetical question based on the limitations supported by the record as a whole. The VE testified that a significant number of jobs exist that can be performed by a person with the limitations described in the hypothetical question. Accordingly, the ALJ's conclusion is supported by substantial evidence.

### RECOMMENDATION

For the reasons set forth above, the Commissioner's decision should be AFFIRMED and judgment should be entered dismissing this case with prejudice.

### SCHEDULING ORDER

The Findings and Recommendations will be referred to a district judge. Objections, if any, are due October 15, 2009. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

IT IS SO ORDERED.

DATED this 1st day of October, 2009.

Paul Papak
United States Magistrate Judge